**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Hensley GARNER, John J. Pagone, Nicholas A. Caputo, Harold J. Knies, Rhey A. Orme, Leo Gruenholz, Donald Hojnacki and Andrew Federinko, Defendants–Appellants.**

**Nos. 86–1707, 86–1711, 86–1734 thru 86–1738, 86–1777.**

United States Court of Appeals, Seventh Circuit.

Argued Sept. 10, 1987.

Decided Dec. 29, 1987.

1406

§ 1962(c) (RICO), and the Hobbs Act, 18 U.S.C. § 1951.[1] The defendants were all House Drain Inspectors for the Department of Sewers of the City of Chicago. They raise on appeal nearly a score of issues. Their primary contentions are that they were improperly joined for trial, that the jury instructions were faulty, that inadmissible evidence was used against them, and that the evidence was insufficient to support their convictions. For the reasons set forth in the following opinion, we affirm all of the convictions.

## I

### General Background

This case involves the payment of bribes by private sewer contractors to sewer inspectors of the City of Chicago. Sewer work on private property in Chicago is performed by contractors regulated by the city. All contractors must be licensed by the city, and a permit and inspection must be obtained for most sewer work.

Sewer contractors pay a fee to the city to obtain work permits. The amount of this fee varies depending on the job that will be done. Before a contractor begins a job, he is required to contact the Department of Sewers and report the type, location, and price of the work. This information is then transmitted to a central desk for assignment to an inspector. The inspector travels to the jobsite to check the contractor's work, handle citizen complaints, and accept the check or money order for the permit fee. Inspections are performed after the work is completed but before the excavation is filled in. Inspectors are not entitled to any payment other than the permit fee. After inspecting the job and accepting the

William T. Huyck, Glenn Seiden, James A. Graham, Edward M. Genson, Thomas A. Corfman, Carol A. Brook, Chicago, Ill., for defendants-appellants.

James P. Fleissner, Asst. U.S. Atty., Chicago, Ill., for plaintiff-appellee.

Before WOOD and RIPPLE, Circuit Judges, and GORDON, Senior District Judge.*

RIPPLE, Circuit Judge.

Eight defendants appeal their convictions for violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C.

---

* Hon. Myron L. Gordon, Senior District Judge, Eastern District of Wisconsin, sitting by designation.

1. The RICO provision at issue, 18 U.S.C. § 1962(c), states:
 It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

 The Hobbs Act, 18 U.S.C. § 1951, proscribes extortion, which the statute defines as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." 18 U.S.C. § 1951(b)(2).

 All eight defendants were convicted of violating RICO, and all defendants except Hensley Garner were convicted of violating the Hobbs Act.

permit fee, the inspectors return the fee to the permit desk by interoffice mail.

The government does not contend that the defendants ever failed to remit the permit fee. Rather, this case involves the payment of additional amounts to inspectors by contractors. At trial, the government presented evidence demonstrating that sewer contractors, as a matter of course, gave inspectors from $10 to $20 per inspection. The government contended that this system was the product of a conspiracy among the sewer inspectors, and that the receipt of these additional payments constituted acts of bribery and extortion. The defendants contended that there was no conspiracy among the inspectors, and that the additional payments to inspectors were mere gratuities and were not intended as bribes nor induced by extortion.[2]

On July 17, 1985, a grand jury returned an 84–count indictment against 14 defendants, all of whom were inspectors for the Department of Sewers of the City of Chicago. In Count 1 of the indictment, all 14 defendants were charged with conspiracy in violation of the RICO statute, 18 U.S.C. § 1962(d). This count of the indictment alleged that the defendants had agreed to conduct the affairs of the Department of Sewers through a pattern of racketeering activity, and it incorporated by reference the predicate acts alleged in the later individual RICO counts. In counts 2–15, each of the 14 defendants was charged with one count of violating the RICO statute, 18 U.S.C. § 1962(c). The indictment alleged numerous acts of racketeering activity by each defendant in violation of the Illinois bribery statute and the Illinois official misconduct statute.[3] In Counts 16–84, each

defendant was charged in five counts with extortion under color of official right in violation of the Hobbs Act.

Eight of the 14 defendants were tried jointly. The trial began on January 6, 1986 and concluded on February 21, 1986. The government's case centered on the testimony of more than 50 witnesses. Most of the witnesses were contractors or their agents who had paid money to inspectors. Many of these witnesses testified under a grant of immunity. Four witnesses were not contractors or their agents, including one of the most important witnesses, Aubrey Blunt, a sewer inspector, who testified under a plea bargain agreement.

The government also introduced a substantial amount of documentary evidence. Many of the sewer contractors retained records of various jobs, and some even kept records of payments to inspectors. Records of the Department of Sewers also were introduced that identified which inspectors had been assigned to particular jobs. Most of the evidence of bribery and extortion was provided by the direct testimony of contractors. As to each defendant, several contractors testified that they made payments to the inspector and that these payments were accepted. At least five contractors testified against each inspector.[4]

The government did not provide as much evidence about the purpose of the payments. A number of contractors characterized the payments as "the system" or the "cost of doing business" in Chicago. Most witnesses testified that they had been trained to pay inspectors by a friend, relative, or co-worker in the business. In a few cases, the inspector explicitly requested payments. In other cases, the contrac-

---

**2.** Six of the eight defendants used this defense. Defendant Harold Knies contended that he never received any payments and that there was no tradition of making payments. Defendant Hensley Garner contended that there was insufficient evidence to establish beyond a reasonable doubt that he had violated any laws.

**3.** The Illinois bribery statute is found at Ill.Rev. Stat. ch. 38, para. 33–1. The Illinois official misconduct statute is found at Ill.Rev.Stat. ch. 38, para. 33–3.

**4.** At least five witnesses testified against defendant Hensley Garner. Appellee's Br. at 13–15. Twenty-two witnesses testified against defendants John Pagone and Nicholas Caputo. *Id.* at 15–35. Eleven witnesses testified against Harold Knies. *Id.* at 35–39. Seventeen witnesses testified against defendant Rhey Orme. *Id.* at 39–44. Thirteen witnesses testified against defendant Leo Gruenholz. *Id.* at 44–48. Eight witnesses testified against defendant Donald Hojnacki. *Id.* at 48–50. Eight witnesses testified against defendant Andrew Federinko. *Id.* at 50–52.

tor paid the inspector for the purpose of encouraging the inspector to look the other way when there was an improper permit or when improper materials were used. Most common, however, was the statement that the payments were made to avoid generalized fears of harassment or delays.

Most of the defendants used the ambiguity regarding the purpose of the payments as their primary defense. These defendants contended that the payments were a longstanding tradition in the industry, that they represented nothing more than mere gratuities, and that there was no expectation by either contractors or inspectors of a quid pro quo. Defendants Harold Knies and Hensley Garner, however, did not use this defense. Defendant Knies contended that he had never received payments, and that there was no custom and practice of making payments. Defendant Garner claimed that there was insufficient evidence to believe beyond a reasonable doubt that he had committed any offenses.

Before the case went to the jury, the defendants moved for a judgment of acquittal on the conspiracy count; the motion was denied. The jury found all of the defendants not guilty of conspiracy. However, the jury found all of the defendants guilty of the individual RICO count, and seven of the eight defendants guilty of at least one extortion count. The defendants filed post-trial motions for new trials and for an arrest of judgment, which were denied. These appeals followed.

## II

### Conspiracy Issues

#### A. *Background*

##### 1. Procedural Context

The defendants filed various pretrial motions. The most important of these motions dealt with the conspiracy charge and with the government's intention to join the defendants for trial. The defendants contended that the conspiracy indictment was insufficient as a matter of law, and that there was no reasonable expectation that the conspiracy would be proved at trial. Therefore, they argued that joinder was inappropriate under Rule 8(b) of the Federal Rules of Criminal Procedure.[5] Several defendants also contended that the court should sever the trial, pursuant to Rule 14 of the Federal Rules of Criminal Procedure,[6] because a joint trial would severely prejudice the defendants. These motions were denied. Furthermore, the court ruled that there was sufficient evidence of conspiracy to warrant the admission of co-conspirators' statements under Rule 801(d)(2)(E) of the Federal Rules of Evidence.

##### 2. Evidence of Conspiracy

As proof of the conspiracy, the government offered a good deal of "custom and practice" evidence. This evidence was admitted over the objection of the defendants. Custom and practice evidence consisted of testimony by contractors concerning the tradition of giving and receiving money in the sewer business. Contractors testified that it had long been customary in the business for inspectors to receive payments of $10 or $20, or even more, per inspection. They tesitifed that these payments were made because it was commonly understood that inspectors would cause hassles and delays if they were not paid. Some contractors testified that they were advised to make these payments by their parents or friends or prior employers, and that the

---

**5.** Rule 8(b) of the Federal Rules of Criminal Procedure provides:

Two or more defendants may be charged in the same indictment or information if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses. Such defendants may be charged in one or more counts together or separately and all of the defendants need not be charged in each count.

**6.** Rule 14 of the Federal Rules of Criminal Procedure provides, in pertinent part:

If it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires.

regular practice was to conceal the payment from the customer by putting it in an envelope or folding the cash into the check for the permit fee.

The government also presented evidence of an established price structure for payoffs. For many years, the standard "fee" for a permit was $10. Later, the price went up to $20. One contractor testified that he was told by an inspector that "the price of poker went up." Tr. 10 at 1416. Several contractors testified that they were told by inspectors that the standard fee had gone up to $20. The defendants conceded at oral argument that there was evidence of "parallel conduct."

Aubrey Blunt, an inspector, testified that he was told by other inspectors that he should take the money out of the envelopes because it was for him, and that the purpose of the payments was to avoid hassles. Blunt related conversations between inspectors describing contractors as "all right" or "one of the good guys." Blunt testified that these expressions meant that the contractor would make payments. Blunt described a discussion in which Rhey Orme, one of the defendants, spoke to a group of inspectors and told them that the contractors should be paying $20 instead of $10.

As additional proof of the conspiracy, the district court admitted evidence from a notebook kept by employees of Wagner & Sons Sewer Company (Wagner & Sons). The book contained the name of the customer, the customer's phone number and address, the employee assigned to the job, the estimated cost of the job, the permit number, the inspector who was paid, the type of job, and the date. Julie Anderson, an employee of Wagner & Sons, testified that the purpose of the book was to prevent double payment to an inspector. Ms. Anderson testified that occasionally one inspector would collect money for another inspector, and that this would be noted in the book. The defendants objected to the admission of the Wagner & Sons notebook because it included evidence of payments that were not charged in the indictment and on the ground that it was unduly preju-

dicial. In its final instructions to the jury, the court did not give a limiting instruction directly relating to the notebook; however, the record does not reveal that one was requested.

### B. *The Joinder Issue*

#### 1. Holding of the District Court

The district court determined before trial that joinder of the defendants was appropriate under Rule 8(b) of the Federal Rules of Criminal Procedure because the government had properly alleged that the defendants were guilty of conspiracy, "which 'ordinarily is sufficient to satisfy Rule 8(b)'s joinder requirements.'" *United States v. Caputo*, No. 85 CR 451, mem. op. at 8 (N.D.Ill. Dec. 26, 1985) (quoting *United States v. Hattaway*, 740 F.2d 1419, 1424 (7th Cir.), *cert. denied*, 469 U.S. 1089, 105 S.Ct. 599, 83 L.Ed.2d 708 (1984)) [hereinafter Mem. op. of Dec. 26, 1985]; R. 236 at 8. The court ruled that it did not need to assess the evidence before trial to decide whether the government would successfully prove conspiracy. Rather, it said that " 'the test for misjoinder is what the indictment charges, not what the trial shows,' or put another way, 'Rule 8 on its face is about pleading rather than proof....'" *Id.* (quoting *United States v. Velasquez*, 772 F.2d 1348, 1354 (7th Cir.1985), *cert. denied*, 475 U.S. 1021, 106 S.Ct. 1211, 89 L.Ed.2d 323 (1986)). Concluding that the conspiracy indictment was legally sufficient, *id.* at 3, the court ruled that joinder was appropriate under Rule 8. *Id.* at 10.

The court then examined whether severance was appropriate under Rule 14 of the Federal Rules of Criminal Procedure. Rule 14 provides for severance if a party is prejudiced by the joinder, even if joinder is appropriate under Rule 8. The court ruled that severance was not necessary here because, although the indictment was lengthy, "the charges are simple (involving only two statutes) and the evidence will be easily compartmentalized." *Id.* The court also noted that severance would have resulted in "numerous duplicative trials which, given the conspiracy charge, would ... be neither simple nor short." *Id.* at 11.

The court also rejected the argument that severance was necessary because of a potential conflict between the defenses of different defendants. Defendants Andrew Federinko and Donald Hojnacki claimed before trial that they were considering using the defense that they never received any payments and that payments were not given as a matter of course. They argued that this defense would conflict with the other defendants' argument that the alleged bribes were mere gratuities. The court ruled that severance is required "'only where the acceptance of one party's defense precludes the acquittal of the other defendant.'" *Id.* (quoting *United States v. Keck*, 773 F.2d 759, 765 (7th Cir.1985)). It then said that there was no conflict between a claim by one defendant that he did not accept payments and a claim by another defendant that payments were mere gratuities. As to the conflict between the defense that payments were not given as a matter of course and the defense that giving gratuities was a tradition in the industry, the court said that "Federinko and Hojnacki can be acquitted on their (possible) theory that they took no money even though a well-established tradition is ultimately determined to have been in existence." *Id.* at 12. Therefore, the court denied the motion for severance under Rule 14.

After trial, the defendants filed a motion for a new trial on the ground that joinder was inappropriate in light of the jury verdict for the defendants on the conspiracy charge. The court ruled that joinder had been in good faith and that there was sufficient evidence to justify joinder under Rule 8(b). *United States v. Caputo*, No. 85 CR 451, mem. op. at 2 (N.D.Ill. Apr. 25, 1986); R. 429 at 2. As to Rule 14, the court said that "the amount of evidence was considerable but could be compartmentalized as to each defendant." *Id.* It added that "[t]he jury was instructed to give each defendant separate consideration." *Id.* Therefore,

the court believed that the defendants had not been prejudiced by the joinder.

### 2. Compliance With Rule 8

#### a. Contentions of the Defendants

The defendants raise two basic arguments with respect to Rule 8. First, they argue that the indictment did not conform to the literal requirements of Rule 8. Second, they argue that, because the jury found the evidence did not support a conspiracy allegation, we must conclude that the government misjoined them in one indictment.

With respect to the first argument, they argue that the conspiracy indictment was invalid as a matter of law and that, therefore, joinder was inappropriate under Rule 8(b). The defendants contend that the government failed in the indictment to allege adequately and to support all essential elements of a RICO conspiracy. In particular, they claim that the indictment was devoid of facts relevant to an agreement. "The government ... did nothing more than restate the word agreement four different ways. This bare allegation, even said four times, is insufficient to meet the higher standard of pleading required in a RICO case such as this." Appellants' Lead Br. at 51.[7]

In support of their second argument, the defendants contend that, because they were all found not guilty by the jury on the conspiracy count, this court now should review the evidence in the light most favorable to the defendants. When the evidence is viewed in that light, the defendants submit, no reasonable juror could have found them guilty of conspiracy. The defendants concede that mere error by the district court on this second ground is insufficient to establish misjoinder under Rule 8(b), and that this circuit's cases suggest that a defendant must show bad faith by the government to establish misjoinder under Rule 8(b). They contend, however, that the bad faith standard has been applied only in

7. The defendants filed seven opening briefs in this appeal. The brief of defendants Harold Knies and Andrew Federinko was the principal brief, and the other defendants incorporated much of this brief into their own briefs. For that reason, the brief of defendants Knies and Federinko will be referred to as Appellants' Lead Brief.

dictum in this circuit, and that the correct standard should be whether the government offered adequate evidence of conspiracy. But under either standard, the defendants submit, joinder was inappropriate under Rule 8(b); they argue that there was little or no evidence of conspiracy, that the conspiracy count was clearly brought in bad faith, and that they were prejudiced by this misjoinder.

### b. Analysis

We cannot agree with either of the defendants' contentions. Under Rule 8(b) of the Federal Rules of Criminal Procedure, joinder of defendants is appropriate if "they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses." It is well-established that a conspiracy charge is a proper basis for joinder under Rule 8(b). *United States v. Dounias*, 777 F.2d 346, 348 (7th Cir.1985). Rule 8(b) only requires that the conspiracy be alleged—there is no requirement that the government demonstrate, at the pleading stage, sufficient evidence to support joinder. *United States v. Bruun*, 809 F.2d 397, 406 (7th Cir.1987) ("Proper joinder is determined from the face of the indictment."). As the Supreme Court has said, "once the Rule 8 requirements [are] met by the allegations in the indictment, severance thereafter is controlled entirely by Federal Rule of Criminal Procedure 14...." *United States v. Lane*, 474 U.S. 438, 447, 106 S.Ct. 725, 731, 88 L.Ed.2d 814 (1986) (interpreting *Schaffer v. United States*, 362 U.S. 511, 80 S.Ct. 945, 4 L.Ed.2d 921 (1960)).

Joinder was appropriate in this case under Rule 8(b). The indictment properly alleged conspiracy. An indictment must state all of the elements of the offense charged; it must inform the defendant of the nature of the charge so that he may defend himself; and it must enable the defendant to plead the judgment as a bar to any later prosecution for the same offense. *United States v. Gironda*, 758 F.2d 1201, 1209 (7th Cir.), *cert. denied*, 474 U.S. 1004, 106 S.Ct. 523, 88 L.Ed.2d 456 (1985). The conspiracy count satisfied those pre-

requisites. The charge recited the elements of the offense, and it specified the nature of the illegal racketeering activity. The count then included by reference the specific factual allegations contained in the individual RICO violations. Further, the conspiracy count properly alleged an agreement. Alleging conspiracy is oftentimes difficult because direct proof of conspiracy is rare. But just as pragmatic concerns must govern the drafting effort, an appreciation of those concerns must govern appellate review. Here, the defendants were on notice of the allegation, and they could defend against it. Moreover, the allegation was sufficiently precise to protect them against double jeopardy. Therefore, conspiracy was properly charged, and joinder was warranted by Rule 8(b).

With respect to the defendants' second argument, if joinder was proper initially under Rule 8(b), they can establish misjoinder only if the evidence at trial demonstrates that the conspiracy indictment was brought in bad faith. *Dounias*, 777 F.2d at 348–49; *United States v. Velasquez*, 772 F.2d 1348, 1354 (7th Cir.1985), *cert. denied*, 475 U.S. 1021, 106 S.Ct. 1211, 89 L.Ed.2d 323 (1986); *Brandom v. United States*, 431 F.2d 1391, 1396 (7th Cir.1970), *cert. denied*, 401 U.S. 942, 91 S.Ct. 950, 28 L.Ed.2d 223 (1972). However, even if the allegation was brought in bad faith, severance is not automatic. The defendants still must establish "actual prejudice" from being misjoined. *Lane*, 474 U.S. at 449, 106 S.Ct. at 732.

The defendants, who have the burden of establishing bad faith, *United States v. Garza*, 664 F.2d 135, 142 (7th Cir.1981), *cert. denied*, 455 U.S. 993, 102 S.Ct. 1620, 71 L.Ed.2d 854 (1982), have provided scant evidence that the conspiracy count was brought in bad faith. Their only argument in support of finding bad faith is that there was "no evidence of conspiracy." Appellants' Lead Br. at 61. We disagree. As the defendants admitted at oral argument, there was substantial evidence of "parallel conduct" among the inspectors. There was also evidence that inspectors picked up payments and delivered them to other inspec-

tors, that inspectors encouraged other inspectors to demand larger payments, that experienced inspectors taught new inspectors how the "system" worked, and that inspectors informed each other about those contractors who made payments and those contractors who did not. This evidence was more than adequate to disprove an inference of bad faith on the part of the government. Therefore, joinder was entirely appropriate under Rule 8(b).

### 3. Compliance With Rule 14

#### a. Contentions of the Defendants

As the Supreme Court noted in *Lane,* "once the Rule 8 requirements [are] met by the allegations in the indictment, severance thereafter is controlled entirely by Federal Rule of Criminal Procedure 14, which requires a showing of prejudice." 474 U.S. at 447, 106 S.Ct. at 731 (1986) (interpreting *Schaffer v. United States,* 362 U.S. 511, 80 S.Ct. 945, 4 L.Ed.2d 921 (1960)). Therefore, we must now examine the defendants' next argument that there was substantial prejudice from the joint trial, and that this prejudice warrants a new trial under Rule 14. As evidence of prejudice, the defendants point out that this case involved a 178–page indictment, with a six-week trial and 348 alleged illegal acts. They claim that the evidence was "massive and complex," requiring severance under the authority of *United States v. Oglesby,* 764 F.2d 1273, 1276 (7th Cir.1985). Appellants' Lead Br. at 63. They also submit that the inconsistent defenses raised by the defendants created extreme prejudice. They contend that no defendant could receive a fair trial when seven defendants were arguing that the payments were mere gratuities, but an eighth defendant was denying any pattern or practice of payments. The defendants admit that individual trials still would have been lengthy because of the conspiracy count, but counter that each trial would not have included nearly as many witnesses or testimony of uncharged bad acts. They concede that the courts have a legitimate interest in joint trials and judicial economy, but that, in this instance, the defendants'

right to a fair trial outweighs those interests.

#### b. Analysis

Rule 14 of the Federal Rules of Criminal Procedure authorizes severance, even if joinder was proper under Rule 8(b), if the joinder prejudices the defendants. Rulings on Rule 14 severance motions are discretionary and the decision of the trial court only will be overturned upon a showing of abuse of discretion. *United States v. Rivera,* 825 F.2d 152, 159 (7th Cir.1987); *United States v. Bruun,* 809 F.2d 397, 407 (7th Cir.1987). Because the district court did not abuse its discretion in denying the defendants' motion for severance, we affirm the district court on this issue.

In *Oglesby,* 764 F.2d at 1276, this court identified four important situations in which severance under Rule 14 might be required: (1) antagonistic defenses conflicting to the point of being irreconcilable and mutually exclusive; (2) massive and complex evidence making it almost impossible for the jury to separate evidence as it related to each defendant when determining each defendant's innocence or guilt; (3) a co-defendant's statement inculpating the moving defendant; and (4) gross disparity in the weight of the evidence against the defendants. While these four situations are not the only ones that might trigger Rule 14, they do provide a helpful reference in reviewing the district court's exercise of discretion.

The district court concluded that the prospect of antagonistic defenses did not merit severance because the defendants did not show that the defenses were mutually exclusive and irreconcilable. The court believed that there was "no antagonism at all between an admission by one defendant that he took money and a claim by another that he did not where the two alleged incidents of money-taking are separate." Mem. op. of Dec. 26, 1985, at 11–12. Similarly, the court believed a defendant could be acquitted on the theory that he took no payments even though a well-established tradition of making payments ultimately is proven. We agree with the district court

on both points, and therefore the court properly declined to order severance based on this issue.

 We also agree with the district court that the evidence was not so massive and complex as to compel severance. The evidence was indeed massive, but it was not complex. The evidence consisted almost solely of testimony by contractors that they gave money to particular inspectors. Moreover, it appears that the jury was able to "segregate the evidence into separate intellectual boxes" and to "compartmentalize the evidence against the defendants." *United States v. Cavale*, 688 F.2d 1098, 1106, 1108 (7th Cir.), *cert. denied*, 459 U.S. 1018, 103 S.Ct. 380, 74 L.Ed. 2d 513 (1982). The jury was instructed carefully to give the defendants separate consideration, and to ignore the evidence against the other defendants. There is every reason to believe that the jury followed this instruction. The jury convicted the defendants on some counts, acquitted on some counts, and could not reach a verdict on others. We note, for example, that the jury did not convict defendant Garner on any of the Hobbs Act counts. This is revealing because it appears that there was somewhat less evidence against Mr. Garner than against the other defendants.

We also note that, even if this case had been severed, each trial still would have involved many evidentiary submissions. Because of the conspiracy charge, each individual trial would have required the government to put forth evidence of custom and practice, and parallel conduct. Thus, the individual trials would themselves have been massive, and judicial resources would have been wasted. Therefore, the district court did not abuse its discretion in denying the severance motion based on the argument that the evidence was "massive and complex."

 The third and fourth factors set forth in *Oglesby* are not particularly relevant here. None of the defendants testified against other defendants, and there was not a "gross" disparity in the weight of the evidence against the defendants. Certainly some defendants were charged with fewer acts than were other defendants, but in no way did this disparity deprive any defendant of a fair trial. Therefore, factors three and four did not warrant a severance.

We are mindful that the jury did eventually acquit the defendants on the conspiracy charge. This is an important factor to be considered in evaluating prejudice. As the Supreme Court said in *Schaffer v. United States*, 362 U.S. 511, 80 S.Ct. 945, 4 L.Ed.2d 921 (1960):

> [We cannot] fashion a hard-and-fast formula that, when a conspiracy count fails, joinder is error as a matter of law. We do emphasize, however, that, in such a situation, the trial judge has a continuing duty at all stages of the trial to grant a severance if prejudice does appear. And where, as here, the charge which originally justified joinder turns out to lack the support of sufficient evidence, a trial judge should be particularly sensitive to the possibility of such prejudice.

*Id.* at 516, 80 S.Ct. at 948. Thus, the district court continually must consider the evidence. If it becomes obvious that the evidence of conspiracy is thin and that prejudice to the defendants will result, a severance should be granted. Usually, such an obvious lack of evidence will be noticeable long before the case is ready for the jury and, in all likelihood, the matter also will be raised in a motion for judgment of acquittal before jury deliberations begin. Fed.R. Crim.P. 29(a). However, if the case is submitted to the jury and the jury acquits the defendant of the charge which was the basis for the joinder, the trial judge must, of course, take that factor into consideration and be "particularly sensitive" in his assessment of whether the defendant was prejudiced by the failure to sever.

 In this case, while the jury ultimately found the defendants not guilty of conspiracy, there is no question that there was sufficient evidence to permit the matter to be submitted to the jury. We are not at all persuaded that any defendant would have obtained a more favorable verdict if severance had been granted, and severance surely would have impinged on the public's

interest in the prudent use of judicial resources. *United States v. Buljubasic,* 808 F.2d 1260, 1263 (7th Cir.), *cert. denied,* — U.S. ——, 108 S.Ct. 67, 98 L.Ed.2d 31 (1987). The district court did not err in denying the defendants' motions for severance.

### C. *Co-conspirators' Statements*

#### 1. Holding of the District Court

The court received a pretrial proffer from the government which disclosed the conspiracy evidence that the government expected to show at trial. Based on this proffer, the court ruled that a preponderance of the evidence showed the existence of a conspiracy, and therefore, the court ruled that co-conspirator statements would be admissible, subject to a motion to strike. After trial, the court concluded that the government had established the existence of a conspiracy by a preponderance of the non-hearsay evidence. It therefore denied the defendants' motion to strike and ruled that the jury could consider the co-conspirators' statements. The court said that there was evidence of discussions "among the defendants concerning what they could expect from various contractor witnesses in the way of amounts—or money, and there is evidence that some of the inspectors together accepted payments from contractors." Tr. 24 at 4811. The court also relied on the custom and practice evidence, and the evidence that payments were concealed from homeowners.

#### 2. Contentions of the Defendants

The defendants argue that the admission of co-conspirators' statements was clearly erroneous. They contend that the government failed to prove by a preponderance of the evidence the existence of a conspiracy. They further contend that the evidence only proved that there were agreements between inspectors and contractors, but that there was no evidence linking inspectors together in a common scheme. "More is required than a series of independent actors committing identical acts while associated with the same enterprise. What is required is evidence of 'mutual dependence

and support' between the defendants." Appellants' Lead Br. at 55 (citations omitted). The defendants submit that, because there was so little evidence of mutual dependence and support, the court committed prejudicial error when it admitted the co-conspirator statements.

#### 3. Analysis

The admissibility of co-conspirators' statements pursuant to Rule 801(d)(2)(E) of the Federal Rules of Evidence is governed by *Bourjaily v. United States,* — U.S. ——, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987). *Bourjaily* reaffirms that the government must show the existence of the alleged conspiracy by a preponderance of evidence. It also establishes, contrary to the earlier precedent in this circuit, see *United States v. Santiago,* 582 F.2d 1128 (7th Cir.1978), that the government may use the co-conspirators' statements themselves as evidence of that conspiracy. *Bourjaily,* 107 S.Ct. at 2782.

This case was tried before the Supreme Court's decision in *Bourjaily.* Therefore, the government filed a pre-trial proffer with the court stating the independent evidence it expected to show at trial. The court ruled that the evidence was adequate to allow co-conspirators' statements to be elicited, subject to a motion to strike. After the trial, the court again examined the evidence and ruled that the jury could consider the co-conspirators' statements because the government had proved the existence of a conspiracy by a preponderance of the independent evidence.

█ Our standard of review on this issue is whether the district court was clearly erroneous. *Id.; United States v. Andrus,* 775 F.2d 825, 840 (7th Cir.1985). Our review of the record persuades us that the court was not clearly erroneous in determining that the conspiracy had been proved by a preponderance of the evidence. Defendants claim that there is no evidence of "mutual dependence and support." To the contrary, there is evidence that contractors occasionally picked up payments and delivered them to other inspectors. The remarkable consistency with which payments

were made and the fact that the inspectors raised the standard fee almost simultaneously from $10 to $20 suggests that the inspectors were communicating with each other and encouraging each other to raise the fee. While the jury concluded that this evidence does not prove conspiracy beyond a reasonable doubt, the district court did not err in concluding that the conspiracy had been proved by a preponderance of the evidence. Therefore, we find no error with the admission of the co-conspirators' statements.

### D. *The Wagner & Sons Notebook*

The court admitted the Wagner & Sons notebook over the repeated objections of the defendants. This evidence was admitted for purposes of proving the conspiracy. It was also admitted as proof of a few charged acts, but not as evidence of uncharged acts. The court conceded that the admission of the notebook was "a close question," tr. 17 at 2834, but believed that the book should be admitted because the "book clearly ... has a connection with the evidence before the jury." *Id.* at 2835.

The defendants submit that the notebook was prejudicial and unreliable, and that Rule 403 of the Federal Rules of Evidence should have barred its admission.[8] In particular, the defendants claim that they were prejudiced because the notebook contains repeated notations of payments next to the initials of defendants, even though the defendants were often not charged in the indictment on those payments. The defendants argue that it would have been impossible for the jury to ignore those notations as evidence of their propensity to take money from sewer contractors. Moreover, the defendants contend, the notebook was of *"no* probative value." Appellants' Lead Br. at 98 (emphasis in original). Therefore, the defendants contend that they are entitled to new trials.

We shall not reverse a trial court's evidentiary decision unless there was a clear abuse of discretion. *Davis v. Lane,* 814 F.2d 397, 399 (7th Cir.1987). In particular, a trial court's "balancing of probative value and unfair prejudice must be accorded 'great deference.'" *Id.* (quoting *West v. Love,* 776 F.2d 170, 174 (7th Cir.1985)). The record reveals that the district court considered the issue to be a close question and gave a great deal of thought to it. We also note that the court was willing to allow the defendants to argue the issue even after the notebook had been admitted. When the district court has given such careful attention to a balancing of prejudice and probative value, we are particularly mindful of our duty not to reverse absent a clear abuse of discretion.

■ The district court did not, in our view, abuse its discretion in admitting the notebook as evidence of conspiracy. The book had some probative value on that issue. Moreover, the possibility of prejudice was not at all great. Most of the defendants admitted that they had received payments but that the payments were "gratuities." Therefore, evidence of payments not specifically charged as substantive offenses did not directly prejudice them with respect to those counts. The notebook simply reinforced a point that they had conceded—the receipt of payments. The only defendants who claimed that they did not receive payments were Mr. Knies and Mr. Garner. Out of the 842 entries in the book, only four have the initials of Mr. Knies and only ten have the initials of Mr. Garner. We cannot say that this minimal reference to uncharged misconduct, when balanced against the probative value of the evidence on the conspiracy count, was unduly prejudicial. We also note that the defendants apparently did not request, at the final instruction conference, a specific limiting instruction about the notebook.[9]

8. Rule 403 of the Federal Rules of Evidence provides:

 Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

9. When the district court ruled that the notebook would be admissible, it said that "of course, the evidence should be limited to the

Finally, we see no reason to second-guess the district judge as to the reliability of the notebook. The admissibility of business records is entrusted to the broad discretion of the trial court, and the court's ruling will not be disturbed absent an abuse of discretion. *United States v. Peters*, 791 F.2d 1270, 1291 (7th Cir.), *cert. denied*, —— U.S. ——, 107 S.Ct. 168, 93 L.Ed.2d 106 (1986).

## III

## RICO Issues

A. *The Illinois Official Misconduct Statute*

1. Holding of the District Court

The defendants filed a motion to strike any references in the indictment to the Illinois official misconduct statute, Ill.Rev. Stat. ch. 38, para. 33–3(d).[10] That statute proscribes the unlawful acceptance of a payment knowing that it was given to reward past or future favors. The defendants contended that violations of that statute do not constitute predicate acts under the RICO statute. The court denied the defendants' motion in a memorandum opinion. *United States v. Caputo*, No. 85 CR 451, mem. op. at 1 (N.D.Ill. Jan. 7, 1986); R.274 at 1. The court noted that racketeering activity within the meaning of the RICO statute includes "any act or threat involving ... bribery ... which is chargeable under State law...." *Id.* at 2 (quoting 18 U.S.C. § 1961(1)(A)). It said that Congress therefore "intended to incorporate those acts constituting bribery in the generic sense, without regard to whether a particular state regards those acts as bribery under its own law." *Id.* at 2 (citing *United States v. Forsythe*, 560 F.2d 1127, 1136–37 (3d Cir.1977)). In the district court's view, Congress intended to include the conduct proscribed in the Illinois official misconduct statute as an act of bribery. The court noted that the RICO statute incorporates all offenses under 18 U.S.C. § 201 as RICO predicate acts, and that 18 U.S.C. § 201(g) proscribes the same conduct as the Illinois official misconduct statute.[11] Therefore, since the federal counterpart to the Illinois official misconduct statute constitutes a RICO predicate act, the court concluded that violations of the Illinois official misconduct statute were also RICO predicate acts. *Id.* at 3.

2. Analysis

The RICO statute defines "racketeering activity" as "any act ... involving ... bribery ... which is chargeable under state law and punishable by imprisonment for more than one year." 18 U.S.C. § 1961(1)(A). The defendants argue that the court committed reversible error when it ruled that a violation of the Illinois official misconduct statute was an "act involving bribery." Appellants' Lead Br. at 66. The defendants argue that the plain meaning of the word "bribery" only includes acts done with a corrupt intent or when there is an agreement that the recipient of the bribe will provide a quid pro quo. Because the Illinois official misconduct statute prohibits the receipt of illegal gratui-

---

conspiracy itself where the events that are recorded are not charged events in another count in the indictment." Tr. 17 at 2834. Although it is unclear from the record whether the district court so instructed the jury at the time the notebook was admitted, the defendants do not contend that the court erroneously failed to do so. The record is unambiguous, however, on the fact that a final instruction about the notebook was not given, and that none was requested in the instruction conference.

**10.** The Illinois official misconduct statute states, in pertinent part:
 A public officer or employee commits misconduct when, in his official capacity, he commits any of the following acts:

 ....
 (d) Solicits or knowingly accepts for the performance of any act a fee or reward which he knows is not authorized by law.

**11.** 18 U.S.C. § 201(g) prohibited any public official, except as provided by law, from asking for, demanding, exacting, soliciting, seeking, accepting, receiving, or agreeing to receive "anything of value for himself for or because of any official act performed or to be performed by him." That section has now been amended slightly; and is found at 18 U.S.C. § 201(c)(1)(B). The changes made in the statute are not material to this appeal.

ties, and the statute has no requirement of corrupt intent or a quid pro quo, the defendants submit that a violation of the statute cannot be a RICO predicate act. This conclusion is reinforced, they note, by the fact that Illinois has a separate statute that explicitly prohibits "bribery." Ill.Rev.Stat. ch. 38, para. 33–1.

In response to the district court's conclusion that Congress intended for the receipt of illegal gratuities to be predicate acts because Congress expressly incorporated violations of the federal unlawful gratuity statute as a predicate act, 18 U.S.C. § 201(g), the defendants contend that Congress did no such thing. The defendants point out that the precise language of section 1961(1)(A) defines "racketeering activity" as "any act which is indictable under ... title 18, United States Code: Section 201 (relating to bribery)." They claim that the parenthetical "relating to bribery" effectively limits the incorporation of section 201 to those parts of that section which relate to the plain definition of "bribery." Therefore, they submit that Congress did not intend for the receipt of an illegal gratuity to be a predicate act, and the district court committed reversible error.

■ The labels placed on a state statute do not determine whether that statute proscribes bribery for purposes of the RICO statute. Congress intended for "bribery" to be defined generically when it included bribery as a predicate act. H.R.Rep. No. 1549, 91st Cong., 2d Sess. (1970), *reprinted in* 1970 *U.S.Code Cong. & Admin.News* 4007, 4032 ("State offenses are included by generic designation."). Thus, any statute that proscribes conduct which could be generically defined as bribery can be the basis for a predicate act. *See United States v. Bagaric,* 706 F.2d 42, 62–63 (2d Cir.), *cert. denied,* 464 U.S. 840, 104 S.Ct. 134, 78 L.Ed.2d 128 (1983); *United States v. Salinas,* 564 F.2d 688, 691–92 (5th Cir.1977), *cert. denied,* 435 U.S. 951, 98 S.Ct. 1577, 55 L.Ed.2d 800 (1978); *United States v. Frumento,* 563 F.2d 1083, 1087 (3d Cir.1977), *cert. denied,* 434 U.S. 1072, 98 S.Ct. 1256, 1258, 55 L.Ed.2d 775, 776 (1978). As the Third Circuit pointed out in *United States*

*v. Forsythe,* 560 F.2d 1127, 1137 (3d Cir. 1977), the congressional statement in the legislative history of RICO that "[s]tate offenses are included by generic designation" manifests a legislative intent to incorporate the Supreme Court's holding in *United States v. Nardello,* 393 U.S. 286, 89 S.Ct. 534, 21 L.Ed.2d 487 (1969), into the RICO statute. The *Forsythe* court said:

Nardello stands for the proposition that alleging a state violation which falls within the generic category of the predicate offense is adequate to charge a violation of the Travel Act. The test for determining whether the charged acts fit into the generic category of the predicate offense is whether the indictment charges a type of activity generally known or characterized in the proscribed category, namely, any act or threat involving bribery.

560 F.2d at 1137 (footnote omitted).

■ The parties disagree as to whether the Illinois official misconduct statute proscribes bribery in the generic sense. As the defendants point out, the statute does not require corrupt intent or an agreement to perform a quid pro quo. But we cannot agree with the defendants that the statute does not proscribe bribery as Congress intended to define that word. As the district court demonstrated, the RICO statute also defines "racketeering activity" as "any act which is indictable under ... title 18, United States Code: Section 201 (relating to bribery)...." 18 U.S.C. § 1961(1)(B). Section 201(c)(1)(B) of title 18 makes it a felony for a public official to unlawfully "receive ... anything of value personally for or because of any official act performed or to be performed by such official...." Thus, the receipt of an illegal gratuity by a federal public official constitutes a RICO predicate act. We see no reason why Congress would have defined bribery more broadly for federal officials than for state officials, particularly when it is remembered that Congress intended for RICO to "be liberally construed to effectuate its remedial purpose." Pub.L. 91–452, Title IX, Section 904(a), 84 Stat. 941 (1970), *reprinted in* 1970 *U.S.Code Cong. & Admin.News* 4007,

4036; *United States v. Kaye*, 556 F.2d 855 (7th Cir.1977).

The defendants contend that the parenthetical clause "relating to bribery" in 18 U.S.C. § 1961(1)(B) means that Congress only intended to incorporate as predicate acts those violations of section 201 that relate to the common definition of bribery. To the contrary, when read in context, the parenthetical "relating to bribery" does not limit the incorporation of section 201, but describes it. Congress incorporated many federal criminal statutes as RICO predicate acts, and each incorporation was followed by a descriptive parenthetical. As another court has said, the "parentheticals are only 'visual aids,' designed to guide the reader through what would otherwise be a litany of numbers." *United States v. Perkins*, 596 F.Supp. 528, 531 (E.D.Pa.1984).

■■■ Our conclusion is further supported by precedent from the Third Circuit. In *Forsythe*, the Third Circuit pointed out that the RICO statute incorporates state offenses according to their generic designation. The court then said that, under Pennsylvania law, there were several offenses fitting within the generic category of bribery, and that bribery is defined generically as "conduct which is intended, at least by the alleged briber, as an assault on the integrity of a public office or an official action." 560 F.2d at 1137 n. 23 (quoting *United States v. Dansker*, 537 F.2d 40, 48 (3d Cir.1976)). In *Perkins*, 596 F.Supp at 531, the court interpreted *Forsythe* to mean that the receipt of an unlawful gratuity was within the generic designation of bribery. We agree with the *Forsythe* court that "[t]he test for determining whether the charged acts fit into the generic category of the predicate offense is whether the indictment charges a type of activity generally known or characterized in the proscribed category, namely, any act or threat involving bribery." 560 F.2d at 1137. We also agree with the court in *Perkins* that an unlawful gratuity is an attack on the integrity of public officials and falls comfortably within the generic classification of bribery.

## B. *The Elements of RICO*

### 1. The District Court's Instructions

The jury was instructed on the individual RICO counts as follows:

In order to sustain the charges in Counts 2, 3, 5, 7, 11, 12, 13, and 14 of the indictment, the Government must prove each of the following propositions with respect to each count:

First, that the City of Chicago Department of Sewers is an enterprise;

Second, that the defendant named in a count was employed by the City of Chicago Department of Sewers;

Third, that the defendant knowingly participated, directly or indirectly, in the conduct of the affairs of the City of Chicago Department of Sewers, through a pattern of racketeering activity, namely: Acts involving bribery or official misconduct as alleged in the indictment; and

Fourth, that the City of Chicago Department of Sewers engaged in interstate commerce or the activities of the City of Chicago Department of Sewers affected interstate commerce.

Tr. 28 at 5627. The defendants contend that this instruction was erroneous because it collapsed two separate elements: (1) participation in the conduct of the affairs of an enterprise; and (2) a pattern of racketeering activity. They argue that this distinction is especially important because RICO is not violated unless the defendants actually participate in the management or operation of the affairs of the Department of Sewers by failing to perform or improperly performing an official duty. By merging the elements together, the defendants contend that the jury could have found the defendants guilty without concluding that the defendants managed or directed the Department of Sewers by means of a pattern of racketeering. Rather, the jury could have found the defendants guilty by finding "some mere relationship between the predicate acts and the affairs of the enterprise." Appellants' Lead Br. at 84.

### 2. Analysis

■■■ The defendants' contention that two elements were collapsed together has

no merit. The district court's instruction tracked, in all material respects, the language of RICO itself. Section 1962(c) of RICO provides:

It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering or collection of unlawful debt.

18 U.S.C. § 1962(c). This language is effectively identical to the court's instruction, and therefore, we do not believe that two elements of RICO were improperly collapsed together. We note, moreover, that RICO does not require that the defendants actually manage or operate the enterprise. This court's decisions have held squarely that a RICO defendant need not have a supervisory position in order to violate section 1962(c). *United States v. Ambrose*, 740 F.2d 505, 512 (7th Cir.1984), *cert. denied*, 472 U.S. 1017, 105 S.Ct. 3479, 87 L.Ed.2d 614 (1985); *United States v. Kovic*, 684 F.2d 512, 516–17 (7th Cir.), *cert. denied*, 459 U.S. 972, 103 S.Ct. 304, 74 L.Ed.2d 284 (1982). RICO only requires that a defendant "use one's position in the enterprise to line one's pocket through a pattern of racketeering activity...." *Ambrose*, 740 F.2d at 512.

Finally, RICO does not require, in cases involving bribery as a predicate act, that the defendants improperly performed or failed to perform an official duty. The language of the RICO statute makes it clear that it is state law that determines whether a predicate act has been satisfied. 18 U.S.C. § 1961(1)(A). As we discuss below, Illinois' bribery statute does not require that a defendant provide a quid pro quo. Therefore, the court correctly declined to instruct the jury that the defendants must have performed improperly or failed to perform an official duty.

## C. *Bribery*

Some of the predicate acts alleged were under the Illinois bribery statute. The defendants complain that the jury was improperly instructed as to the elements of bribery under Illinois law. They submit that bribery under Illinois law is only committed when a defendant willfully requests or accepts a thing of value in return for being influenced in the performance of an official act. They contend that the district court erred by instructing the jury that bribery is committed when a defendant accepts property knowing that it was tendered to him with the intent to influence him in the performance of an official act. The district court instructed the jury as follows:

A person commits the offense of bribery under the Illinois statute when he receives any property knowing that the property was tendered with intent to influence the performance of any act related to his employment or function as a public official or employee. Bribery is committed if the offer is accepted, knowing that the offer was made with the intent that the public official or employee act favorably when necessary to the person offering the money or property.

Tr. 28 at 5622–23.

This instruction was wholly consonant with Illinois law. The Illinois bribery statute, Ill.Rev.Stat. ch. 38, paras. 33–1(d) and (e), clearly envisions that a defendant can be guilty of bribery without agreeing to be influenced. That statute reads:

A person commits bribery when:

....

(d) He receives, retains or agrees to accept any property or personal advantage which he is not authorized by law to accept knowing that such property or personal advantage was promised or tendered with intent to cause him to influence the performance of any act related to the employment or function of any public officer, public employee, juror or witness; or

(e) He solicits, receives, retains, or agrees to accept any property or personal advantage pursuant to an understanding that he shall improperly influence or attempt to influence the performance of any act related to the employ-

ment or function of any public officer, public employee, juror or witness.

Ill.Rev.Stat. ch. 38, paras. 33–1(d), (e). It is clear from paragraph 33–1(d) that there is no requirement under Illinois law of an agreement to be influenced in the performance of an official act. If there were such a requirement, paragraph 33–1(e) would be redundant. Therefore, there was no error with the district court's bribery instruction. Furthermore, as discussed above, there was no error in the court's refusing to instruct the jury that bribery as a predicate act under RICO requires an agreement to be influenced in the performance of an official act.

## IV

## The Hobbs Act

### A. *Contentions of the Defendants*

The defendants' next argument is that the court should have instructed the jury that a violation of the Hobbs Act requires a finding that the defendant affirmatively induced payments.[12] The defendants' argument is based on *United States v. O'Grady*, 742 F.2d 682 (2d Cir.1984) (en banc), in which the Second Circuit ruled that inducement is an essential element for extortion under the Hobbs Act. Although the defendants concede that cases in this circuit have held that affirmative inducement is not a requirement in the Hobbs Act, they contend that our cases are inconsistent and that the issue should be revisited.

The defendants submit that we should rule that inducement is required under the statute for three reasons. First, they maintain that the Hobbs Act's express language makes inducement an element. Second, they claim that the legislative history "tends to support" that inducement is an element. Appellants' Lead Br. at 75. And, third, they argue that the inducement requirement is necessary to distinguish be-

tween legal and illegal conduct. That is, if inducement is not an element under the Hobbs Act, public officials will be unable to determine the boundaries of appropriate conduct.

The defendants submit in the alternative that the court's instruction was erroneous because it failed to instruct the jury correctly on the element of wrongful use of office. They claim that a wrongful use of office should have been defined for the jury as an agreement to influence the performance of an official act, and that the court erred because it only required a finding that the payment was made because of the public employee's office. Appellants' Lead Br. at 76.

### B. *Analysis*

■ The Hobbs Act defines extortion as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." 18 U.S.C. § 1951(b)(2). Because the defendants believe that our decisions are contradictory on this subject, they recommend that we adopt the position of the Second Circuit, which has held that the Hobbs Act requires an affirmative inducement. *United States v. O'Grady*, 742 F.2d 682 (2d Cir.1984) (en banc). Our examination of the case law does not lead us to believe that there is any confusion in this circuit. In *United States v. Holzer*, 816 F.2d 304 (7th Cir.1987), *vacated and remanded on other grounds*, —— U.S. ——, 108 S.Ct. 53–54, 98 L.Ed.2d 18 (1987), this court recently considered the elements of a Hobbs Act violation. Summarizing the law of this circuit, we said:

> Extortion under "color of official right" equals the knowing receipt of bribes; they need not be solicited. That at least is the view in this circuit. The Second

12. The court instructed the jury that the payment of the fee must have been "induced under 'color of official right.'" Tr. 28 at 5631. The court added that "[e]xtortion under color of official right does not require proof of specific acts by the public employee demonstrating force, threats, or the use of fear so long as the victim consented because of the office or posi-

tion held by the employee who obtained the money." *Id.* at 5631–32. The defendants objected that this statement was inaccurate, and that the jury should have been instructed that "the mere acceptance of money by a public employee with knowledge that his office was the motivation behind the giving of the money does not establish inducement." Tr. 26 at 5211.

Circuit has taken a different view, see *United States v. O'Grady*, 742 F.2d 682 (2d Cir.1984) (en banc), but one we have declined to follow. In this circuit it is extortion if the official knows that the bribe, gift, or other favor is motivated by a hope that it will influence him in the exercise of his office and if, knowing this, he accepts the bribe.

*Id.* at 311 (citations omitted).

The defendants cite two cases, *United States v. Schmidt*, 760 F.2d 828 (7th Cir. 1985), *cert. denied*, 474 U.S. 827, 106 S.Ct. 86, 88 L.Ed.2d 71 (1985), and *United States v. Conn*, 769 F.2d 420 (7th Cir.1985), for the proposition that *Holzer* inaccurately summarized the law in this circuit. In *Schmidt*, the court said that inducement is not required to prove extortion, 760 F.2d at 832, but then it went on to note that Schmidt's convictions would be affirmed even under the higher standard of the Second Circuit's *O'Grady* ruling. *Id.* Most certainly this does not mean that the court adopted *O'Grady*. In *Conn*, referring back to *Schmidt*, this court said, in dictum, that there was "sufficient evidence of solicitation to support Schmidt's conviction," 769 F.2d at 424; however, as we have just noted, *Schmidt* did not change the law in this circuit. Therefore, we are not persuaded that this circuit's decisions on this question are in any way dissonant, and we decline to adopt defendants' suggestion that we reevaluate this issue. We note, moreover, as did the court in *Holzer*, that there is "an air of the academic about this intercircuit conflict...." 816 F.2d at 311. For instance, in this case, while we have not required that affirmative inducement be proven as a distinct element of the offense, the evidence of record certainly establishes that the defendants received these payments because the industry well understood that, if the payments were not made, doing business would become very difficult. The money was paid out of fear that nonpayment would result in injury from the abuse of public power—and everyone, including the recipients, well understood that "given."

As to the defendants' contention that the court should have instructed the jury to find a wrongful use of office, we first note that the court did so instruct; the court instructed the jury that "[e]xtortion under color of official right means the obtaining of money by a public employee through wrongful use of his office...." Tr. 28 at 5631. Second, we do not believe that the jury should have been instructed that "wrongful use of office" means an agreement to perform an official act in exchange for a benefit. As we quoted above, *Holzer* said that "it is extortion if the official knows that the ... favor is motivated by a hope that it will influence him in the exercise of his office and if, knowing this, he accepts the bribe." 816 F.2d at 311. There is thus no requirement that there be any agreement, and the court's instruction was not erroneous.

## V

### The Defendants' Other Contentions

#### A. *Sufficiency of the Evidence*

Six defendants assert that the evidence against them was insufficient to support their convictions. They claim that many of the contractors were biased because of plea bargain or immunity agreements with the government. They claim that many witnesses offered inconsistent accusations and were frequently unable to identify the inspectors. Finally, they contend that there was no evidence presented to establish the essential elements as to extortion and bribery. That is, they argue there was no proof of inducement or wrongful use of office in order to establish a violation of the Hobbs Act, and no proof of an agreement to be influenced in the performance of an official act. Because there was no evidence presented as to these elements, the defendants maintain that their convictions are without support. Our standard of review on this issue is a familiar one: Viewing the evidence in the light most favorable to the prosecution, could any rational trier of fact have found the defendants guilty beyond a reasonable doubt? *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979).

As the defendants point out, many of the contractor witnesses had motives to lie, either because they were testifying under immunity or because of personal circumstances. However, it is the jury's prerogative to accept or reject testimony. *United States v. Jones*, 808 F.2d 561, 569 (7th Cir.1986), *cert. denied,* — U.S. —, 107 S.Ct. 1630, 95 L.Ed.2d 203 (1987). A jury is uniquely qualified to handle issues of credibility. Therefore, "absent extraordinary circumstances," we will not reevaluate testimony to examine motives and other measures of reliability. *United States v. Noble*, 754 F.2d 1324, 1332 (7th Cir.), *cert. denied,* 474 U.S. 818, 106 S.Ct. 63, 88 L.Ed. 2d 51 (1985). Similarly, we place little importance on the defendants' contention that many of the witnesses failed to identify the inspectors, or offered inconsistent accusations. There was substantial evidence for the jury's verdicts; the defendants have not established that the verdicts were in any way unreasonable.

The defendants next argue that the government failed to establish all of the elements of RICO and the Hobbs Act. We do not agree. To establish guilt on the RICO counts, the government had to prove that the defendants were employed by an enterprise, the Department of Sewers, that the defendants knowingly participated in the conduct of the affairs of that enterprise through a pattern of racketeering activity, i.e. bribery or official misconduct, and that the Department of Sewers affected interstate commerce. To establish bribery or official misconduct, the government had to prove that the defendants accepted payments for the performance of an act knowing that the payments were illegal, or knowing that they were intended to influence the performance of an unlawful act. We are persuaded that adequate evidence was presented on all of these issues. The defendants argue at length that there was no evidence to conclude that there was any agreement to influence the performance of an official act, but as we have ruled, this is not an element of bribery in Illinois. Therefore, we affirm the RICO convictions.

The government also offered sufficient evidence to establish the elements of the Hobbs Act. The government offered evidence that the defendants accepted payments knowing that the payments were motivated by a hope that they would influence the defendant in the exercise of his office. We believe that there was ample evidence from which a rational juror could have found the defendants guilty on these counts. The defendants argue that there was no evidence presented of inducement, but again, inducement is not an element of extortion in this circuit.

B. *Prosecutorial Misconduct*

1. The Record

Counsel for Mr. Garner pointed out in his closing argument that Mr. Garner had not been charged with any acts out of the Wagner & Sons notebook, but that he had been charged with acts recorded in a notebook kept by the Pender Sewer Company. Counsel for Mr. Garner then asserted that the Pender notebook was not nearly as reliable as the Wagner & Sons notebook, and that the jury should not conclude that the Pender notebook was reliable just because the Wagner & Sons notebook was reliable.

Counsel for the government, in rebuttal, went beyond the mere issue of reliability. Counsel for the government said:

> Well, you take a look at it, ladies and gentlemen. Between December of 1980 and November of 1981, in the Wagner and Sons book, there are 10 "GA" or "G" entries in that book, and you check with the city records and you are going to find every one of those jobs comes back to Hensley Garner. And then Mr. Huyck wants you to believe that Mr. Garner doesn't know what this money is for.

Tr. 28 at 5574. Counsel for Mr. Garner did not raise an objection to the government's argument. At oral argument, the attorney said that he did not object because juries often are angered by attorneys who interrupt their opponent during closing argument.

## 2. Defendant Garner's Contentions

Mr. Garner contends that he was prejudiced by the government's reference in closing argument to Mr. Garner's initials in the Wagner & Sons notebook because he had not been charged with any acts relating to the notebook. Mr. Garner claims that the prosecutor's reference was not appropriate because Mr. Garner's attorney had only referred to the Wagner & Sons notebook to point out that the Pender notebook was not very reliable. He contends that the government's action was prejudicial because the jury could not be expected to remember that he had not been charged with any acts associated with the notebook.

Mr. Garner also contends that the government's closing argument violated Rule 29.1 of the Federal Rules of Criminal Procedure. That rule sets forth the order of closing argument: prosecution, defense, and then rebuttal by the prosecution. The purpose of the rule is to allow the defense to hear the government's argument before making its closing argument. He contends that the rule was violated because the government did not make its Wagner & Sons notebook argument until its rebuttal, prohibiting Mr. Garner's counsel from responding to it.

Finally, Mr. Garner submits that the government's argument violated Rules 403 [13] and 404(b) [14] of the Federal Rules of Evidence. He claims that Rule 403 was violated because the argument's prejudicial effect vastly outweighed its probative value. He claims that Rule 404(b) was violated because the government's purpose for making the argument was to prove intent by pointing out uncharged acts, but that intent was not an issue that had been raised at trial. Mr. Garner claims that his sole defense was that there was insufficient evidence to prove beyond a reasonable doubt that he received payments, and that intent was not a defense.

## 3. Analysis

We begin by noting that Mr. Garner's attorney did not object to the government's comment. The defendant contends that he should not be required to raise an objection in closing argument. He submits that raising an objection in closing argument angers the jury. Our cases, however, suggest that prosecutorial misconduct in closing argument only is reviewable under the plain error doctrine when counsel has failed to object to the statement. *United States v. Tucker*, 820 F.2d 234, 237 (7th Cir.1987). Under the plain error doctrine, we must search for "an actual miscarriage of justice, which implies the conviction of one who but for the error would have been acquitted." *United States v. Silverstein*, 732 F.2d 1338, 1349 (7th Cir.1984), *cert. denied*, 469 U.S. 1111, 105 S.Ct. 792, 83 L.Ed.2d 785 (1985); *see also United States v. Brantley*, 786 F.2d 1322, 1328 (7th Cir.), *cert. denied*, 477 U.S. 908, 106 S.Ct. 3284, 91 L.Ed.2d 572 (1986).

The defendant argues that he had not raised the issue of the Wagner & Sons notebook in his argument, and that the issue of intent, to which the prosecutor's statement was directed, was not a defense raised by Mr. Garner. We note, however, that the government may introduce evidence of prior acts to establish intent when specific intent is an element of the crime, even if the defendant has not placed intent into question. *Brantley*, 786 F.2d at 1329. Here, the notebook had been admitted into evidence, and the government was permitted to comment on that evidence. Specific intent was an element of the crimes with which Mr. Garner had been charged. Therefore, we are not convinced that the comment was plain error, under the high standards of that doctrine. Similarly, the comment was not plain error under Rule 403, which requires a careful balancing of prejudice and probative value.

**13.** For the text of Rule 403, see *supra* note 8.

**14.** Rule 404(b) of the Federal Rules of Evidence provides:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

### C. *Jury Deliberations*

Shortly after the jury began deliberating on February 14, 1986, it requested a copy of the testimony in the case. The court told the jury that a transcript had not yet been prepared and that the jury would have to rely on its collective memory. Three days later, the jury again requested a transcript. The court refused to provide it. The next day the jury asked again for a copy of the transcript, telling the district court that one of the jurors occasionally had napped during the testimony[15] and was "having great difficulty recalling the testimony which she missed." Tr. of Feb. 18 at 2. The court instructed the jury to continue its deliberations because a transcript was not yet available and would not be available for several weeks. The defendants moved for mistrial because of the court's refusal to provide a transcript. This motion was denied.

The defendants claim that it was abundantly clear that the jurors were unable to recall much of the testimony. They argue that the court's refusal to provide the jury with a transcript was reversible error because the court has a responsibility to eliminate jury confusion. Appellants' Lead Br. at 99. They claim that the jury's repeated requests for a transcript indicate that the jury was hopelessly confused and could not have reached a fair and just verdict.

■ Our standard of review on this issue is whether the district court abused its discretion. *United States v. Croft,* 750 F.2d 1354, 1367 (7th Cir.1984). The district court denied the jury's request for a transcript because one had not been transcribed and because it would have taken approximately one month to prepare one. Under these circumstances, the district court's decision to ask the jury to continue deliberating was most certainly not an abuse of discretion.

### VI

### Conclusion

We have reviewed all of the defendants' contentions on appeal. Appellants received a fair trial and there was no reversible error. Accordingly, we affirm the judgment of the district court.

AFFIRMED.

---

**15.** The defendants do not contend that any error resulted from the juror having slept during the trial. Any contention of error based on an inattentive juror is of no moment if not brought to the attention of the trial court. *See United States v. Baker,* 609 F.2d 134, 140 (5th Cir.1980).